# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

AMY ROBERTSON, on behalf of        )
C.C., a minor,                     )
                                   )
            Plaintiff,             )      No. 03:12-cv-00111-HU
                                   )
vs.                                )
                                   )
CAROLYN W. COLVIN[1],              )   **FINDINGS AND RECOMMENDATION**
Commissioner of Social Security,   )
                                   )
            Defendant.             )
                    _____


Rory Joseph Linerud
Linerud Law Firm
P.O. Box 1105
Salem, OR 97308-1105

     Attorney for Plaintiff


S. Amanda Marshall
United States Attorney
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2904


David Morado
Regional Chief Counsel, Region X, Seattle
Benjamin J. Groebner
Special Assistant United States Attorney
Office of the General Counsel
701 Fifth Avenue, Suite #2900 M/S 221A
Seattle, WA  98104-7075

     Attorneys for Defendant

_____

     [1]Carolyn W. Colvin became acting Commissioner of Social
Security on February 24, 2013.  Therefore, pursuant to Federal Rule
of Civil Procedure 25(d), she is automatically substituted for
Michael J. Astrue as Defendant in this case.

1 - FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff Amy Robertson, on behalf of C.C., a minor, seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's final decision denying C.C.'s application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* Robertson argues the Administrative Law Judge ("ALJ") erred in finding C.C.'s impairment was not functionally equivalent to a listed impairment, and the Appeals Council erred in failing to give adequate weight to the opinion of C.C.'s treating physician, or alternatively to request additional evidence from the treating physician. *See* Dkt. ## 16 & 18.

## *I.  PROCEDURAL BACKGROUND*

C.C.'s application for SSI benefits was filed on February 17, 2009, a few weeks before C.C.'s seventh birthday, claiming C.C. had been disabled since February 13, 2009, due to Attention Deficit Hyperactivity Disorder ("ADHD"), "to a high extent." (A.R. 155-62; 108-11[2])  C.C.'s application was denied initially and on reconsideration. (A.R. 55-59; 66-68)  Robertson requested a hearing (A.R. 70-71), and a hearing was held on July 20, 2010, before an ALJ.  Robertson and C.C. appeared at the hearing with their

---

[2]The administrative record ("A.R.") was filed electronically using the court's CM/ECF system.  Dkt. #10 and attachments.  Pages of the A.R. contain at least three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #10-6, Page 6 of 10) and a Page ID#; and a page number located at the lower right corner of the page, representing the numbering inserted by the Agency.  Some pages also contain a page number inserted by the office supplying the records.  Citations herein to "A.R." refer to the agency numbering in the lower right corner of each page.

2 - FINDINGS & RECOMMENDATION

attorney.   Robertson was the only witness who testified at the hearing.  (A.R. 34-52)   On July 29, 2010, the ALJ issued his decision, denying C.C.'s application for benefits.  (A.R. 17-30) Robertson appealed the ALJ's decision, and submitted a Childhood Disability Evaluation Form completed by C.C.'s treating physician. On November 18, 2011, the Appeals Council denied Robertson's request for review (A.R. 1-5), making the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481. Robertson filed a timely Complaint in this court seeking judicial review of the Commissioner's final decision denying C.C.'s applica-tion for SSI benefits.  Dkt. #2.  The matter is fully briefed, and the undersigned submits the following findings and recommended disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.   FACTUAL BACKGROUND

### A.   Summary of the Medical and Educational Evidence

During the 2007-2008 school year, C.C. attended kindergarten at a Head Start program at a school in Toledo, Oregon.  (A.R. 122) On October 11, 2007, the school Principal wrote a letter to Robertson, expressing concern about C.C.'s "somewhat higher than average absentee rate for this time of year," noting six absences since the term began. (A.R. 125)   The Principal noted that poor attendance was likely to interfere with school performance.  (*Id.*) The Principal wrote a followup letter on November 28, 2007, expressing "continuing concern" about C.C.'s attendance.  (A.R. 123)   On February 28, 2008, he wrote a letter regarding C.C.'s frequent tardiness. (A.R. 127)  By this time, C.C. had 16 absences

3 - FINDINGS & RECOMMENDATION

1  and 25 instances of tardiness.  (A.R. 128)    By March 10, 2008,
2  C.C. had 23 absences and 25 tardies.  (A.R. 129-30)

3      On March 11, 2008, C.C. received a report card for the 2007-
4  2008 school year.  The school indicated the purpose of such a
5  report card "is to inform parents of their child's progress on
6  state benchmark standards." (A.R. 131)  The report card indicates
7  C.C. was on target to "exceed" the benchmark standards in only one
8  area: "Segments words." (*Id.*)  Although on target to meet several
9  of the standards, C.C. was not currently meeting the standards in
10 the following areas: producing letter sounds, recognizing some
11 sight words, writing upper and lower case letters; printing C.C.'s
12 first name, using upper and lowercase letters; using inventive
13 spelling; putting forth appropriate effort in speaking/listening;
14 listening when others are speaking; understanding and following
15 one- and two-step directions; putting forth appropriate effort in
16 math; using manipulatives to add and subtract up to 10; reading,
17 writing, and ordering numbers less than ten; following directions;
18 completing tasks on time; being responsible with time/materials;
19 working independently; completing homework; and staying focused on
20 work. (*Id.*)  C.C.'s teacher noted C.C. was "smart," but "not
21 usually able to reflect this, due to . . . lack of ability to focus
22 and stay on task." (A.R. 132)  The teacher expressed her "hope
23 that over the summer a little maturation [would] help." (*Id.*)

24     C.C. was having notable difficulty with literacy skills,
25 including understanding and naming letters, associating letter
26 sounds with symbols, and demonstrating early reading and writing
27 skills. (A.R. 133)  C.C. could not define common words, and did
28 not know C.C.'s own birthday or telephone number.  (A.R. 141)

4 - FINDINGS & RECOMMENDATION

1  Notes indicate C.C.'s "[e]xcessive absences and tardies [were]
2  preventing [C.C.] from consistent learning experiences." (A.R. 133)
3  Regarding C.C.'s ability to pay attention and stick with a task,
4  the teacher noted C.C. was "everywhere," and despite being on
5  Adderall, C.C. "still doesn't sit & pay attention. [C.C.'s] mind
6  is always going somewhere. It's hard to get [C.C.] to pay
7  attention to anything even [when] interested." (A.R. 143) When
8  playing games on the internet, C.C. would finish a turn, and "then
9  start trying to find a different game." *Id.* When the teacher
10  wanted C.C. to do something, it required repeated reminders to C.C.
11  about the required task, and the teacher often "end[ed] up just
12  doing it for [C.C.]." *Id.*

13      On May 7, 2008, Robertson took C.C. to Community Health
14  Centers of Lane County ("CHCLC"), where C.C. was seen by Board-
15  certified pediatrician Catherine A. Grenier, M.D. On the intake
16  questionnaire, Robertson noted, "I think [C.C.] may be ADHD."
17  (A.R. 235)

18      On May 10, 2008, at Dr. Grenier's request, Robertson completed
19  a "Child Behavior Questionnaire for Parents." (A.R. 238-39) She
20  indicated C.C. "Always" exhibits the following behaviors:

21          *   Seem not to listen when spoken to
            *   Become easily distracted by extraneous stimuli
22          *   Fidget with hands/squirm in seat
            *   Leave their seat when sitting still is required
23          *   Run about or climb excessively
            *   Seem "on the go", or "driven by a motor"
24          *   Deliberately annoy others
            *   Blame others for his/her own mistakes
25          *   Seem self-conscious, or easily embarrassed

26  (*Id.*) She indicated C.C. exhibits the following behaviors "A Lot":

27          *   Have difficulty keeping attention (tasks/play)
            *   Have difficulty organizing tasks & activities
28          *   Avoid/dislike tasks requiring sustained thought

5 - FINDINGS & RECOMMENDATION

     *     Have difficulty awaiting their turn
     *     Interrupt or intrude on others' conversations
     *     Talk excessively
     *     Blurt out answers before questions completed
     *     Lose his/her temper
     *     Seem touchy or easily annoyed by others
     *     Actively defy requests or rules
     *     Argue with adults
     *     Lie
     *     Initiate physical fights
     *     Been physically cruel to people (e.g. bully)
     *     Seem fearful, anxious, or worried
     *     Seem afraid to try new things fearing mistakes
     *     Have their feelings easily hurt
     *     Boast and brag

(*Id.*)  Robertson indicated C.C. exhibits the following behaviors "A Little":

     *     Make careless mistakes in schoolwork
     *     Often lose things necessary for tasks/projects
     *     Often seem forgetful in daily activities
     *     Seem angry or resentful
     *     Seem spiteful or vindictive
     *     Swear or use obscene language
     *     Deliberately set fires ("set bed on fire")
     *     Physically harm animals
     *     Deliberately destroy another's property
     *     Use a weapon in a fight
     *     Feel worthless or inferior
     *     Blame self for problems or feel guilty
     *     Seem sad, unwanted, lonely, depressed
     *     Seem shy
     *     Want to run things, be in charge

(*Id.*)  She indicated C.C. never exhibits the following behaviors:

     *     Steal without confronting victim
     *     Steal and confront victim
     *     Run away
     *     Skip school without your knowledge
     *     Broken into a car, house, or business
     *     Seem clingy, needing constant reassurance
     *     Seem moody, with quick & drastic changes

(A.R. 239)

On May 12, 2008, at Dr. Grenier's request, C.C.'s kindergarten teacher completed a "Child Behavior Questionnaire for Teachers." (A.R. 240-41)  The form lists a number of behaviors and asks the teacher to indicate whether the child exhibits each behavior "Not

At All," "A Little," "A Lot," or "Always."  (*Id.*) C.C.'s teacher indicated C.C. "Always" exhibited the following behaviors:

    *    Make careless mistakes in schoolwork
    *    Have difficulty keeping attention (tasks/play)
    *    Seem not to listen when spoken to
    *    Have difficulty organizing tasks & activities
    *    Avoid/dislike tasks requiring sustained thought
    *    Often lose things necessary for tasks/projects
    *    Become easily distracted by extraneous stimuli
    *    Often seem forgetful in daily activities
    *    Fidget with hands/squirm in seat
    *    Leave their seat when sitting still is required
    *    Run about or climb excessively
    *    Seem "on the go", or "driven by a motor"
    *    Have difficulty awaiting their turn
    *    Interrupt or intrude on others' conversations
    *    Talk excessively
    *    Blurt out answers before questions completed
    *    Actively defy requests or rules
    *    Deliberately annoy others
    *    Disturb other children as they work
    *    Seem to daydream
    *    Excessively demand the teacher's attention
    *    Appear to lack leadership ability
    *    Seem immature for their age
    *    Seem to have any difficulty learning
    *    Seem uncooperative with the teacher

(*Id.*)  The teacher indicated C.C. exhibits the following behaviors "A Lot":

    *    Blame others for his/her own mistakes
    *    Have demands that must be met immediately
    *    Seem to have no sense of fair play
    *    Deny mistakes or blame others for them

(A.R. 241), and the following behaviors "A Little":

    *    Lose his/her temper
    *    Seem touchy or easily annoyed by others
    *    Argue with adults
    *    Seem to not be able to get along with others
    *    Seem uncooperative with classmates
    *    Seem easily frustrated in their efforts

(*Id.*)  The teacher indicated C.C. never exhibits the following behaviors:

    *    Seem angry or resentful

7 - FINDINGS & RECOMMENDATION

```
*       Seem spiteful or vindictive
*       Swear or use obscene language
*       Act "smart" (sassy)
*       Have temper outbursts
*       Exhibit unpredictable behavior
*       Seem overly sensitive to criticism/redirection
*       Pout and sulk
*       Exhibit quick and drastic mood changes
*       Seem quarrelsome
*       Appear to be unaccepted by the other children.
```

(*Id.*)

On June 11, 2008, Dr. Grenier saw C.C. for followup and review of the questionnaires.  The doctor indicated C.C. met the criteria "for inattention and hyperactivity at home and school." (A.R. 233) She prescribed Adderall 5 mg. each morning for one week, increased to 10 mg. each morning thereafter.  (*Id.*)  Adderall was continued at the 10 mg./day dosage on July 23, 2008.  (*Id.*)

Dr. Grenier saw C.C. on July 25, 2008, and the doctor noted C.C. was "much better on Adderall."  (A.R. 231)

On September 16, 2008, C.C. saw Board-certified pediatrician Maureen Hollander, M.D. at Lane County Mental Health ("LCMH") for followup. Notes indicate C.C. had experienced a "recent break-through of [symptoms] related to lack of medication." (A.R. 230) C.C. was given a one-month refill of Adderall 10 mg., and was directed to return in 26 to 28 days for the next refill.  Notes indicate, "Encouraged compliance [with] appts. to avoid disruption of Rx plan."  (*Id.*)  The doctor also noted, "Consider formal Behavior Modification Rx plan (collaboration [with] school staff and LCMH staff)."  (*Id.*)

On October 1, 2008, C.C.'s maternal grandmother took him to see Dr. Hollander for followup.  C.C.'s grandmother stated C.C. "'ran out' of Adderall 'couple days ago.'  She saw [C.C.] was

8 - FINDINGS & RECOMMENDATION

'running low' 1 wk. ago so she called main clinic for early appt (10/1/08)[.]"  (A.R. 229)   The grandmother stated C.C.'s mother "thought she was supposed to [increase] dose after one week to 1½ tabs."  (*Id.*)   The doctor noted C.C. was alert and appropriately active, playing with blocks.  C.C. was "talkative at times," and "quit helpful (picking up toys)."   C.C. responded well to encouragement and positive reinforcement.  (*Id.*)  Per the family's report, C.C. was improving on the Adderall.  The doctor indicated some concern about "inappropriate dosing of child by mom" due to potential side effects for the child, or "misuse/abuse/diversion of Rx" by the mother.  (*Id.*)   The doctor requested a repeat behavior questionnaire by C.C.'s first grade teacher, for comparison with the form completed by C.C.'s kindergarten teacher.  The doctor also had a "long discussion" with C.C.'s grandmother regarding the importance of coordinating C.C.'s behavior modification plan with both school and home, together with the medication therapy.  She also advised the grandmother of the potential side effects of Adderall, and the importance of following the prescribed dosage. She refilled C.C.'s Adderall for one month, with the next refill to be given at the next followup visit.  (A.R. 228-29)

C.C.'s grandmother and an aunt took him to see Dr. Hollander for followup on October 7, 2008.  They reported school, in general, was "going better."  C.C.'s teacher had written a note home stating C.C. was "doing well," although C.C. had been sent to the principal's office a few times during the first week back on the Adderall, and C.C. also had "a few referrals by [the] bus driver." (A.R. 230)

9 - FINDINGS & RECOMMENDATION

1    On October 15, 2008, C.C.'s grandmother took him back to LCMH,
2  where C.C. saw a nurse-practitioner.  Notes indicate: "6yr old here
3  [with] grandmother.  She is very concerned about out of control
4  behaviors (urinating on walls, hurting other children) since [C.C.]
5  started generic Adderall from [the] mental health clinic last week.
6  Mother stopped meds after 4 days and the aggression stopped.
7  [Grandmother] says she flushed meds down the toilet and now [C.C.]
8  is on no meds.  I told [grandmother] that I would be unable to
9  [prescribe] anything new as [C.C.] had been given med just last
10  week.  She will get ADHD questionnaire filled out and followup with
11  Dr. Hollander 10/30."  (A.R. 227)

12    A poor photocopy makes other treatment notes from October 2008
13  largely illegible, but it appears the Adderall was refilled.  (*See*
14  A.R. 226)  On December 18, 2008, C.C. saw a nurse-practitioner at
15  CHCLC for a medication review.  C.C.'s mother indicated, in a
16  letter, that although C.C.'s behavior had "improved significantly
17  during the day," C.C. was having regular nightmares and "difficulty
18  going to sleep as a result of that."  (A.R. 225)  C.C.'s mother
19  wondered about a medication change.  The nurse-practitioner con-
20  sulted a pediatric treatise, and talked with a doctor in the
21  clinic, and they decided to prescribe a low dose of Clonidine half
22  an hour before bedtime, with the Adderall to continue without
23  change.  Followup was scheduled with Dr. Hollander.  (*Id.*)

24    On February 11, 2009, C.C. was seen at CHCLC for followup.
25  Notes indicate C.C. was not on any medications, having been "taken
26  off Adderall" three weeks earlier due to "night terrors."  (A.R.
27  224)  "Dr. Hollander was going to try Strattera"; however, C.C. was
28  "no better off Adderall."  (*Id.*)  C.C. had been sent to the clinic

10 - FINDINGS & RECOMMENDATION

by the school because C.C. was "having problems." (*Id.*)  C.C. had
slept better on the Clonidine, and night terrors were better when
C.C.'s bedroom light was left on at night, but on January 9, 2009,
Dr. Hollander had discontinued the Clonidine and Adderall because
she was "concerned about PTSD."  (*Id.*)  C.C. had been off all
medications for two weeks, but was still having night terrors, and
C.C.'s behavior problems had flared up at school.  Notes indicate
C.C.'s teachers asked that C.C.'s medications be restarted.  (*Id.*)
On examination, C.C. was "alert, somewhat distracted and inattent-
ive when addressed."  (*Id.*)  The medications were restarted, and
C.C. was referred to "Eugene Speech and Hearing," and "LCMH
Psychiatry." (*Id.*)

   C.C. was seen at the Eugene Hearing & Speech Center on
March 2, 2009, "for an audiological evaluation secondary to
educational concerns."  (A.R. 244)  C.C.'s hearing was normal in
both ears.  (*Id.*)

   On March 17, 2009, Internal Medicine specialist Sharon B.
Eder, M.D. and psychologist Megan D. Nicoloff, Psy.D. reviewed the
record and completed a Childhood Disability Evaluation Form
regarding C.C.  (A.R. 247-52)  They found C.C.'s ADHD, though a
severe impairment, did not meet or functionally equal any of the
listings.  They found C.C.'s limitations to be either completely
absent, or "less than marked," in all domains (*id.*), and noted
C.C.'s "severe limits . . . are successfully remediated by
medication to non severe."  (A.R. 252)  On June 10, 2009, Pediatric
specialist Martin B. Lahr, M.D. and psychologist Robert Henry,
Ph.D. reviewed the record, and concurred with Drs. Eder and
Nicoloff.  (A.R. 253-58)  Drs. Lahn and Henry noted C.C.'s first

11 - FINDINGS & RECOMMENDATION

grade teacher indicated C.C. was working at grade level, but had "high absenteeism." C.C. had "some moderate difficulty acquiring and using information but very few problems attending and completing tasks when on meds." (A.R. 258) C.C.'s behavior had improved greatly on the medications, and C.C.'s teacher found C.C. "to be very little trouble . . . calm, attentive and trying hard," and, when taking the medications, "a great [child] and student!" (*Id.*)

On April 6, 2009, C.C.'s first grade teacher completed a questionnaire regarding C.C.'s overall functioning. (A.R. 168-75) The teacher indicated C.C. had no problems acquiring and using information, and was functioning appropriately for C.C.'s age. She indicated C.C. sometimes needed "a little support, confirming instructions." (A.R. 169) She noted that when C.C. was on medication, C.C. got "right to work" and "[t]rie[d] hard." (A.R. 170) Obvious problem areas noted were organizational skills and completing assignments, with "slight problems" noted in paying attention when spoken to, sustaining attention during play/sports activities, focusing long enough to finish assigned activities or tasks, carrying out multi-step instructions, changing from one activity to another without being disruptive, completing work accurately without careless mistakes, working without distracting self or others, and working at a reasonable pace or finishing on time. (*Id.*)

The teacher noted C.C. has problems interacting and relating with others, which had resulted in the implementation of a "behavior modification chart," which awarded "stars" for good behavior. (A.R. 171) She indicated C.C. has "slight" problems playing

cooperatively with other children, seeking attention appropriately, following rules, respecting/obeying adults in authority, relating experiences and telling stories, and introducing and maintaining relevant and appropriate topics of conversation. (*Id.*) The teacher also indicated C.C. has difficulties moving about and manipulating objects, noting C.C. "gets excited" and "[l]ikes to entertain [C.C.'s] neighbors." (A.R. 172) Slight problems also were noted in C.C.'s ability to manage the pace of physical activities or tasks, and integrate sensory input with motor output. (*Id.*) Although the teacher indicated C.C. did not have problems with self-care when on medications, she also indicated C.C. "skips meds often." (A.R. 173) When C.C. takes medications regularly, C.C. is "calm, attentive, tries hard . . . [and is] a great [child] and student!" (A.R. 174)

On July 24, 2009, C.C. and Robertson saw marriage and family therapist Jen Walsh, M.Ed. for an intake evaluation for C.C. to begin counseling. C.C.'s current problems were listed as "mean toward animals" and "anger." (A.R. 279) During the assessment, Robertson stated she was "concerned about [C.C.'s] behaviors and lack of remorse." (A.R. 281) She stated C.C. exhibited aggressive behaviors, lashing out at siblings and "often harm[ing] animals," and she "suspect[ed] [C.C.] was responsible for the death of [C.C.'s] brother's pet bird." (*Id.*) She reported that C.C. had set fire to a mattress about a year-and-a-half earlier, and did not seem to understand the danger this could have caused. Robertson stated C.C. showed poor regulation of emotions, and this had worsened over the previous two years. She indicated a desire for C.C. to be able to talk about feelings rather than just acting on

13 - FINDINGS & RECOMMENDATION

them.   She also expressed concern over C.C.'s apparent lack of empathy when C.C. had "caused harm to a person or animal." (*Id.*)

Robertson stated C.C. "is very good at reading and . . . very focused when using the computer or playing video games." (A.R. 282)  C.C. described feeling "calm and relaxed when . . . swim-ming," and listed "recess an[d] playing games" as favorite school interests. (A.R. 282-83)  Robertson indicated C.C. "was doing much better in school" since starting on ADHD medications.  (A.R. 283)  Walsh noted C.C.'s attitude was "guarded," but C.C.'s appearance, motor activity, mood, affect, alertness, memory, thought process and content, and judgment, all were within normal limits.  (A.R. 283-84)  Walsh recommended a course of therapy, and noted C.C.'s treatment goal as: "Increase verbal expression of anger from 5% of the time to 50% [of the] time . . . in 6 months."  (A.R. 280)  Interventions to achieve this goal were listed as: "Explore alter-natives to physical aggression," "Practice self-soothing strate-gies," and "Practice ways to communicate anger/hurt workably." (*Id.*)

Robertson and C.C. saw Walsh for counseling on August 4, 2009. Robertson reported that one of C.C.'s brothers had been staying with a grandmother because he and C.C. fought frequently.   C.C. admitting being scared of this brother.   C.C. also admitted to being "mean" to a younger brother.  (A.R. 278)  C.C. met with Walsh again on August 11, 2009, and reported getting along better with C.C.'s brothers.  (A.R. 277)  On September 18, 2009, when C.C. met with Walsh, she noted C.C. was "quiet . . . and had a difficult time talking about anything" other than the game C.C. was playing. (A.R. 276)  Walsh noted C.C. "was able to focus on the game for the

14 - FINDINGS & RECOMMENDATION

whole session." She showed C.C. a breathing exercise to try when C.C. became frustrated with a task. (*Id.*)

At C.C.'s next session with Walsh, on September 22, 2009, she noted C.C. "was very guarded when . . . asked questions about home." (A.R. 275) Walsh suggested that Robertson "initiate a conversation with the kids about fighting and give each an oppor-tunity to talk about their thoughts about . . . recent arguing between [Robertson and her boyfriend]." (*Id.*) At the next session, on September 29, 2009, C.C. brought a caterpillar with him. After some discussion about what a caterpillar would like to do, C.C. agreed to release the caterpillar outside, which C.C. did during the session. Walsh noted C.C. was "imaginative in . . . play," but did not want to talk. (A.R. 274)

C.C. saw Walsh on October 6, 2009, and C.C. reported that things were "good" at school and home. C.C. stated Robertson and "Ronnie" had fought once, "but it 'wasn't so bad'." (A.R. 273) C.C. "focused on finding animals [in the playroom] that could 'eat each other.'" (*Id.*)

On October 8, 2009, Walsh met with Robertson and her boyfriend "Ronnie," to discuss how they thought C.C. was doing. They stated C.C. had "been 'talking back' a lot recently," and Ronnie expressed frustration because Robertson did not "back him up when he asks [C.C.] to do something." (A.R. 272) Walsh described how C.C. "was able to show empathy regarding the caterpillar." (*Id.*) She also commented on C.C.'s "guarded nature." (*Id.*) She scheduled another session with the couple to work on parenting skills, such as creating "a list of behaviors that will no longer be tolerated at home." (*Id.*)

15 - FINDINGS & RECOMMENDATION

1    Walsh saw C.C. again on October 13, 2009.  She noted C.C. "was
2  distracted and seemed rushing when . . . choosing pictures for a
3  collage."  (A.R. 271)  She noted C.C. exhibited thoughtfulness in
4  wanting to tear maps out of the magazines to "'show people the way
5  around," and looking for car ads "because Mom needs a new car."
6  (*Id.*)

7    On October 21, 2009, Walsh met with C.C. and older brother
8  Colby.  C.C. "was cheerful and seemed please to share the session
9  with Colby."  (A.R. 270)  C.C. "was able to focus on a board game
10 for half of the session," and although C.C. became frustrated when
11 C.C. was behind in the game, C.C. "was able to recover and re-
12 engage in the activity."  (*Id.*)  C.C. was unable to remember
13 earning any rewards at home for good behavior.  (*Id.*)

14   On October 23, 2009, Walsh met with Robertson and Ronnie
15 again, to work on parenting issues.  They had worked on a behavior
16 chart for the children, and Walsh encouraged them to "take some
17 time for themselves in order to strengthen their connection and
18 communicate better with the [children][.]"  (A.R. 269)

19   On November 3, 2009, C.C. apparently made a statement to Walsh
20 that caused her to contact a DHS Child Welfare screener.  Walsh
21 noted the screener "took the information," and stated there would
22 be no further action taken.  Walsh reported to Robertson "that the
23 report was made and that no action would be taken."  (A.R. 268)
24 Walsh stated "she would like to continue working with the family."
25 Robertson replied that she was not sure she wanted to have C.C. and
26 Colby continue with counseling, stating she "'can't handle reports
27 having to be made every time [C.C.] lies.'"  (*Id.*)  Walsh
28 "explained that treatment could focus on understanding the reasons

1  why [C.C.] would say such things." (*Id.*) No further sessions were
2  scheduled.   On December 1, 2009, Walsh sent Robertson a letter
3  noting C.C. had "made some progress in treatment," working on "some
4  self soothing strategies such as deep breathing," and suggesting
5  [C.C.] "could likely benefit from further treatment." (A.R. 267)
6     On July 28, 2010, Robertson's attorney wrote to Dr. Grenier,
7  asking her opinion regarding C.C.'s limitations.   The attorney
8  explained the Social Security criteria for a disabled child, noting
9  the child must demonstrate a "marked" limitation in two or more of
10 the following "domain categories": acquiring and using information,
11 attending  and  completing  tasks,  interacting  and  relating  with
12 others, moving about and manipulating objects, caring for himself/
13 herself, and health and physical well-being.   He noted Robertson
14 had  testified,  at  the  ALJ  hearing,  that  C.C.  "has  the  most
15 difficulty with the first 3 domains," and "is at a 'marked' level
16 of disability [sic] regarding [the] ability to attend and complete
17 tasks, and when interacting and relating with others." (A.R. 286)
18 The attorney then asked Dr. Grenier to answer the following two
19 questions by checking "Yes" or "No" for each: (1) "Do you agree
20 that [C.C.] is 'markedly' limited in [the] ability to Attend and
21 Complete Tasks, and Interact and Relate With Others?" and (2) "Do
22 you  agree  that  [C.C.]  has  seen  some  improvement  because  of
23 medicine,  but  the  improvement  is  minimal  in  that  [C.C.]  still
24 demonstrates marked levels of impairment despite medicine?" (A.R.
25 286-87)   Dr. Grenier checked the "Yes" box for both questions.
26 Each question also indicated "Please explain if necessary," but no
27 explanation was provided. (*Id.*)
28

17 - FINDINGS & RECOMMENDATION

1     Dr. Grenier also completed a Childhood Disability Evaluation
2 Form, indicating her opinion that C.C.'s condition "functionally
3 equals the listings," but providing no discussion or explanation
4 other than indicating the two areas of "marked" limitation
5 discussed in the attorney's letter.  (A.R. 288-93)

6

7                     **B.  *Hearing Testimony***

8     Robertson was the only witness at the July 20, 2010, ALJ
9 hearing.  She stated C.C. lives with her and C.C.'s two brothers,
10 ages ten and six.  C.C.'s father lives in Medford, and C.C. sees
11 him during the summertime.  (*Id.*; A.R. 44)  At the time of the
12 hearing, C.C. was eight years old, and was preparing to enter the
13 third grade at school.  C.C. is in regular classes.  Although C.C.
14 is not in special education classes, C.C. is in a small group for
15 reading. (A.R. 38-39)  Robertson indicated C.C.'s grades have been
16 "getting better . . . like, Cs and Bs."  (A.R. 42)  C.C. does not
17 participate in any extracurricular activities.  (*Id.*)

18     C.C.'s primary medication has always been Adderall, although
19 "a sleeping aid" was prescribed at one time.  (A.R. 40)  According
20 to Robertson, C.C.'s dosage of Adderall has increased over time.
21 (A.R. 40-41)  C.C. sees a pediatrician, Dr. Grenier, every five or
22 six months.  C.C. was seen by a psychologist or psychiatrist in the
23 past, and currently was seeing a counselor.  (A.R. 41-42)  C.C.
24 takes medication year-round.  (A.R. 44)

25     The ALJ asked Robertson why she thinks C.C. is disabled.
26 Robertson responded that C.C. "has a different way of thinking,"
27 and it is already apparent to Robertson that C.C. is "going to have
28 a hard time as an adult."  (A.R. 43)  She stated C.C. "spends a lot

of time at home and . . . doesn't even play with [C.C.'s] brothers, really." (*Id.*) C.C. recently had picked up a snail, "ripped [its] shell off, and ripped one of [its] eyes off, and thought it was funny and just put it back on the grass. . . . Strange, strange things." (*Id.*) The family has a pet, but Robertson will not allow C.C. to be alone in a room with the pet. (*Id.*) On one occasion, she let C.C. have a gerbil. She stated C.C. "squeezed the gerbil so really hard, that . . . [it] latched on [C.C.'s] thumb, and [C.C.] had to shake it, and it slapped against the wall." (A.R. 46) C.C. also has ripped the wings off flies and thrown them off the balcony. (A.R. 47) C.C. also has "scraped drywall off [the] walls," and broken toys. (A.R. 44)

According to Robertson, C.C. sometimes has to "sit[] out in the hallway" at school, and "actually has a spot outside the door, because [C.C.] doesn't sit and pay attention in class." (A.R. 39, 45) She stated C.C. does not listen in class, and she frequently gets calls from C.C.'s teacher, which caused Robertson to ask the doctor to increase C.C.'s medication dosage. (A.R. 45) She stated C.C. is overly sensitive to things people say, and always feels picked on. (*Id.*) C.C. has been suspended from school twice, for two days, and C.C. "got kicked off the bus," so Robertson provides C.C.'s transportation to and from school. (A.R. 41) She stated C.C. is unable to stay on task without guidance and redirection, and almost anything can distract C.C. For instance, C.C. was helping Robertson put away the dishes. C.C. would put a couple away, and then just walk off. Robertson would call C.C. back, and the behavior would repeat itself. (A.R. 46)

19 - FINDINGS & RECOMMENDATION

1    Robertson stated when C.C. has trouble figuring something out,
2  C.C. will throw the object or walk away from the task, "and just
3  get really angry.  And not angry at the object, just angry at
4  everybody in general."  (*Id.*)   She stated C.C. has problems
5  relating to other children.  C.C. made friends with a child who
6  moved into the same apartment complex, but the two were only
7  friends for a couple of days before C.C. punched the child in the
8  stomach, resulting in the child's mother calling the police.  (A.R.
9  47)  She stated C.C. will hit other children, yell at them, or say
10 "really mean things to them," and as a result, C.C. "doesn't have
11 any friends," and stays indoors all the time.  (*Id.*; A.R. 50)  C.C.
12 also does not play with C.C.'s siblings, arguing with the older
13 brother, and hurting the younger brother by "grab[bing] his ears
14 really tight," or choking him.  (A.R. 50)  Robertson fears leaving
15 the younger child alone with C.C. because of the choking.  (A.R.
16 51)  C.C.'s behavior with animals also worries Robertson.  (*Id.*)
17 Robertson feels C.C. has difficulty understanding right from wrong,
18 and does not understand the consequences of C.C.'s actions.  When
19 she tries to explain that something is not right, like what C.C.
20 did to the snail, C.C. thinks the behavior is "just playing" and
21 "everything is fine, still."  (A.R. 48)  Robertson started C.C. in
22 counseling, but she indicated C.C. will behave well during the
23 counseling session, and as soon as they leave, C.C.'s "same old"
24 behavior will resume, such as yelling at Robertson, or "throw[ing]
25 a fit in the backseat while [she is] driving."  (*Id.*)  She stated
26 C.C. "has anger issues."  (*Id.*)

27    Robertson described an incident when C.C. set a fire.  C.C.
28 "had gotten a lighter," and went into a bedroom.  Robertson smelled

20 - FINDINGS & RECOMMENDATION

1  smoke.  When she went into the bedroom, C.C. was sitting on one bed
2  playing with toys.  Robertson looked at the other bed "and there
3  was smoke coming out from under a pillow.  [She] moved the pillow
4  and it was smoldering."  (A.R. 49)  Robertson got water and put out
5  the fire, and the whole time, C.C. "was sitting there, playing with
6  Legos."  (*Id.*)  Robertson continued to smell smoke, moved the Lego
7  box, and discovered C.C. had "started a fire under the Lego box[.]"
8  (*Id.*)

9      Robertson stated she has to sit with C.C. to be sure homework
10 assignments are completed.  This takes awhile because C.C. will
11 fein misunderstanding of something, such as math, which C.C.'s
12 teacher has indicated C.C. does understand.  C.C. will get mad at
13 Robertson, and they will have to take a break for C.C. to calm down
14 before they can continue.  (A.R. 49-50)

15

16 ## III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF

17 ### A.   Legal Standards

18     The Commissioner employs a three-step sequential evaluation
19 process for determining whether a child (i.e., an individual under
20 age 18) is disabled.  20 C.F.R. § 416.924(a).  First, the Commis-
21 sioner determines whether the child is working at the substantial
22 gainful activity level.  *Id.*  If so, the child is not disabled,
23 "regardless of . . . medical condition or age, education, or work
24 experience."  20 C.F.R. § 416.924(b).  If the child is not working,
25 then the next question is whether the child has an impairment (or
26 more than one) that is severe.  To be "severe," the impairment must
27 cause  more  than  minimal  functional  limitations.    20  C.F.R.
28 § 416.924(c).  If there is no severe impairment, the child is not

1  disabled.   20 C.F.R. § 416.924(a) & (c).   If an impairment is
2  severe, the Commissioner next looks to see if the severe impairment
3  meets, medically equals, or is functionally equivalent to the
4  listings.   20 C.F.R. § 416.924(a) & (d).

5       The functional equivalence evaluation is undertaken if the
6  child "has a severe impairment or combination of impairments that
7  does not meet or medically equal any listing[.]"   20 C.F.R.
8  § 416.926a(a).  The child's functional activities are evaluated "in
9  terms of six domains," which describe "broad areas of functioning
10 intended to capture all of what a child can or cannot do."   20
11 C.F.R. § 416.926a(b)(1).  The six domains are: "(i) Acquiring and
12 using information; (ii) Attending and completing tasks; (iii)
13 Interacting and relating with others; (iv) Moving about and
14 manipulating objects; (v) Caring for [oneself]; and, (vi) Health
15 and physical well-being."   *Id.*   In each of these domains, the
16 Commissioner considers information relating to activities the child
17 can, and cannot, perform; restrictions or limitations on the
18 child's activities compared to other children the same age;
19 difficulty the child has with activities at home, school, or
20 elsewhere; the child's difficulty independently initiating,
21 sustaining, or completing activities; and how much and how
22 frequently the child needs help in performing activities.   20
23 C.F.R. § 416.926a(b)(2).

24      An impairment functionally equals the listing level of
25 severity if the child has "marked" limitations in two of the six
26 domains listed above, or an "extreme" limitation in one domain.   20
27 C.F.R. § 416.926a(d).  A "marked" limitation is "'more than moder-
28 ate' but 'less than extreme.'"  20 C.F.R. § 416.926a(e)(2)(ii).  It

"interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Id.* An "extreme" limitation is "'more than marked,'" and "interferes very seriously" with these abilities. 20 C.F.R. § 416.926a(e)(3)(i). An "'extreme limitation' does not necessarily mean a total lack or loss of ability to function." *Id.* In determining the severity of a child's limitations, the Commissioner also may rely on standardized test scores, if available, and for the sixth domain of functioning (health and physical well-being), also may consider the frequency of illness, and other medical signs and symptoms relating to the child's impairment. 20 C.F.R. § 416.926a(e)(2)(iii) & (iv), (e)(3)(iii) & (iv). If there are no standardized test scores available and the child is under age 3, then the Commissioner will look to the child's functional level in relation to the child's chronological age. 20 C.F.R. § 416.926a(e)(2)(ii), (e)(3)(ii).

In a Social Security Ruling, the Commissioner has explained that this "technique for determining functional equivalence accounts for all of the effects of a child's impairments singly and in combination – the interactive and cumulative effects of the impairments – because it starts with a consideration of actual functioning in all settings. We have long called this technique our 'whole child' approach." SSR 09-1p, available at 2009 WL 396031 (Feb. 17, 2009).

As with adult claimants, the burden lies with the child disability claimant "to prove that he meets or equals a Listing." *Gray ex rel. Whymss v. Comm'r*, 454 Fed. Appx. 748, 750 (11th Cir. 2011) (citing *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991)); *Lowery v. Comm'r*, 55 Fed. Appx. 333, 341 (6th Cir. 2003)

23 - FINDINGS & RECOMMENDATION

1   (parent had burden to show child had marked limitations); *Russell*
2   *v. Astrue*, 742 F. Supp. 2d 1355 (N.D. Ga. 2010) (child disability
3   applicant had burden of establishing medically-determinable impair-
4   ment affecting his functioning); *see also Bowen v. Yuckert*, 482
5   U.S. 137, 146, 107 S. Ct. 2287, 2293-94, 96 L. Ed. 2d 119 (1987)
6   generally, Social Security claimant has burden to prove disa-
7   bility).

8

9                       **B.   The ALJ's Decision**

10      The ALJ found C.C. was preschool age at the time C.C.'s
11  application was filed, and was school age by the time of the ALJ's
12  decision.  He found C.C. had not engaged in substantial gainful
13  activity at any time since the application date of February 17,
14  2009. (A.R. 20)  The ALJ found C.C.'s ADHD is a severe impairment,
15  but it does not meet or medically equal a listed impairment. (*Id.*)
16  The ALJ therefore undertook the evaluation of whether C.C.'s
17  impairment is functionally equivalent to any listed impairment.  He
18  concluded that C.C. has a "marked" limitation in the third domain -
19  interacting and relating with others (A.R. 25-26); no limitation in
20  the fourth domain - moving about and manipulating objects (A.R. 26-
21  27); and less than marked limitations in the remaining domains
22  (A.R. 22-25, 27-29).  He therefore concluded C.C. is not disabled.
23  (A.R. 30)

24

25                     **IV.   STANDARD OF REVIEW**

26      The court may set aside a denial of benefits only if the
27  Commissioner's findings are "'not supported by substantial evidence
28  or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.*

24 - FINDINGS & RECOMMENDATION

1  *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*
2  *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*
3  *V. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1
4  (9th Cir. May 20, 2011).  Substantial evidence is '"more than a
5  mere scintilla but less than a preponderance; it is such relevant
6  evidence as a reasonable mind might accept as adequate to support
7  a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
8  1039 (9th Cir. 1995)).

9      The court "cannot affirm the Commissioner's decision 'simply
10 by isolating a specific quantum of supporting evidence.'"  *Holohan*
11 *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*
12 *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
13 must consider the entire record, weighing both the evidence that
14 supports the Commissioner's conclusions, and the evidence that
15 detracts from those conclusions.  *Id.*  However, if the evidence as
16 a whole can support more than one rational interpretation, the
17 ALJ's decision must be upheld; the court may not substitute its
18 judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.*
19 *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

20
21                        ***V.   DISCUSSION***

22     Robertson argues the ALJ erred in failing to find C.C. has a
23 marked limitation in the second domain - attending and completing
24 tasks.  Dkt. ##16 & 18.  Specifically, she argues the ALJ and the
25 Appeals Council "failed to consider the most important piece of
26 probative evidence, the treating physician's statement." Dkt. #16,
27 pp. 7-8.  Robertson maintains Dr. Grenier's indication that C.C.
28 has a marked limitation in this area, despite C.C.'s medications,

25 - FINDINGS & RECOMMENDATION

1   should have triggered the agency's duty to develop the record

2   further regarding C.C.'s ability to attend and complete tasks.

3   Dkt. ##16 & 18.

4         The ALJ found as follows regarding his decision that C.C.'s

5   impairment in this domain is less than marked:

> This domain considers how well a child is able
> to focus and maintain attention, and how well
> he is able to begin, carry through, and finish
> activities, including the mental pace at which
> he performs activities and the ease of
> changing activities. Attending and completing
> tasks also refers to a child's ability to
> avoid impulsive thinking and his ability to
> prioritize competing tasks and manage his time
> (20 CFR 416.926a(H) and SSR 09-4p).

> Social Security rules provide that a pre-
> schooler without an impairment should be able
> to pay attention when he is spoken to direct-
> ly, sustain attention to his play and learning
> activities, and concentrate on activities like
> putting puzzles together or completing art
> projects.  The child should also be able to
> focus long enough to do many more things
> independently, such as gathering clothes and
> dressing, feeding, or putting away toys.  The
> child should usually be able to wait his turn
> and to change his activity when a caregiver or
> teacher says it is time to do something else.
> The child should be able to play contentedly
> and independently without constant supervision
> (20 CFR 416.926a(h)(2)(iii) and SSR 09-4p).

> Social Security rules provide that a school-
> age child without an impairment should be able
> to focus his attention in a variety of situa-
> tions in order to follow directions, remember
> and organize school materials, and complete
> classroom and homework assignments.  The child
> should be able to concentrate on details and
> not make careless mistakes in his work (beyond
> what would be expected in other children of
> the same age who do not have impairments).
> The child should be able to change activities
> or routines without distraction, and stay on
> task and in place when appropriate.  The child
> should be able to sustain attention well
> enough to participate in group sports, read by
> himself, and complete family chores.  The
> child should also be able to complete a tran-

sition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation (20 CFR 416.926a(h)(2)(iv) and SSR 09-4p).

Social Security regulation 20 CFR 416.926a(h)(3) and SSR 09-4p set forth some examples of limited functioning in this domain that children of different ages might have. The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods. In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain. Some examples of difficulty children could have in attending and completing tasks are: (i) is easily startled, distracted, or over-reactive to everyday sounds, sights, movements, or touch; (ii) is slow to focus on, or fails to complete, activities of interest (e.g., games or art projects); (iii) repeatedly becomes side-tracked from activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including ones he is capable of completing; (v) requires extra supervision to remain engaged in an activity; or (vi) cannot plan, manage time, or organize self in order to complete assignments or chores.

The claimant has less than marked limitation in attending and completing tasks. The claimant's mother testified that the claimant will only stay on tasks with direction. During his medical treatment the claimant's ability to complete age appropriate tasks was noted to be "much better" on the medication Adderall, as reported on July 25, 2008[.] The claimant's 1st grade teacher completed a teacher questionnaire dated April 6, 2009, wherein she noted that the claimant had no problems to an obvious problem in attending and completing tasks[.] She reported that the claimant "gets right to work, now that [the claimant is] on . . . medication. Tries hard." Overall the claimant has no more than a less than marked limitation in his ability to attend to and complete tasks.

(A.R. 24-25; citations to exhibits omitted)

As noted above in the summary of the medical and educational evidence, C.C.'s teacher indicated C.C. has "obvious" problems in

27 - FINDINGS & RECOMMENDATION

the areas of organizing C.C.'s "own things or school materials," and in "[c]ompleting class/homework assignments." (A.R. 70) C.C. has "slight" problems in several other areas relating to attending to and completing tasks. (*Id.*)  It appears the teacher answered the questions in this domain considering C.C.'s functioning "[w]hen on medication." (*Id.*)  The teacher's indication that C.C. has problems completing assignments is consistent with Robertson's hearing testimony.

Dr. Grenier's opinion in this regard was quite limited, and she did not support her statements with any explanation.  Further, her opinion was given when, according to the evidence of record, she had not seen C.C. for more than a year.  Nevertheless, the only evidence even slightly contradicting the doctor's opinion and Robertson's testimony is the teacher's statement that C.C. was working better and trying hard on the medication.  Getting "right to work" and trying hard are not indications that C.C. is able to "complete" tasks.  The same is true for Dr. Grenier's clinical note that C.C. was "much better" on Adderall; "much better" is not an indication of the degree of improvement with regard to C.C.'s ability to attend to and complete tasks.  Although the first grade teacher indicated C.C. was "a great [child] and student" when C.C. was taking Adderall, the teacher also indicated that even while on medication, C.C. continues to have difficulty completing tasks. When considered together with Robertson's testimony regarding C.C.'s often troubling behavior, the evidence leads the court to conclude Dr. Grenier's opinion that C.C.'s limitations in this domain are "marked" was enough to trigger the duty to develop the record further to resolve ambiguities in the evidence and assure

28 - FINDINGS & RECOMMENDATION

1   that C.C.'s interests were considered fully. *See Tonapetyan v.*
2   *Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *Brown v. Heckler*, 713
3   F.2d 441, 443 (9th Cir. 1983) (*per curiam*).

4       The Commissioner notes the state agency consultants who
5   reviewed the record concluded C.C.'s "ability to attend and
6   complete tasks was less than marked." Dkt. #17, p. 6 (citing A.R.
7   247-49, 253-55).   The ALJ did not rely on, or even mention, the
8   state agency consultants' opinions in reaching his decision, nor
9   did the Appeals Council mention those opinions in rejecting
10  Dr. Grenier's opinion.   The court cannot assume the consultants'
11  opinions formed a basis for the ALJ's decision. *See Hassen v.*
12  *Comm'r*, 421 Fed. Appx. 738, 739 (9th Cir. 2011) (court cannot
13  "provide *post-hoc* rationalizations for the ALJ's decision"); *see*
14  *also Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) ("As a
15  general rule, more weight should be given to the opinion of a
16  treating source than to the opinion of doctors who do not treat the
17  claimant.") (citation omitted).

18      The court finds the record does not contain substantial
19  evidence to support the ALJ's decision that C.C. has a less-than-
20  marked limitation in the second domain.   Because the ALJ correctly
21  found that C.C. has a marked limitation in the third domain, the
22  issue of the degree of C.C.'s limitation in the second domain is
23  determinative of whether C.C. is disabled. *See* 20 C.F.R.
24  § 416.926a(d).   Accordingly, the case should be remanded for
25  further development of the record regarding C.C.'s limitation in
26  attending and completing tasks.   It would seem, at a minimum, that
27  the Commissioner should obtain and evaluate: (1) an explanation
28  from Dr. Grenier for her check-box answers on the form supplied by

29 - FINDINGS & RECOMMENDATION

1  C.C.'s attorney indicating C.C. has a marked limitation in the
2  ability to attend and complete tasks, and to interact and relate
3  with others; and that C.C.'s marked impairment continues despite
4  medication (*see* A.R. 286-93); (2) an explanation for the reason
5  Dr. Grenier stopped treating C.C.; (3) a more recent evaluation
6  report and/or testimony by Dr. Grenier, or another acceptable
7  medical source with appropriate training and experience, regarding
8  C.C.'s functional limitations; and (4) a more recent report from
9  C.C.'s teachers, especially after first grade.[3]

10

11                          *VI.   CONCLUSION*

12      For the reasons discussed above, the undersigned recommends
13  the Commissioner's decision be reversed, and the case be remanded
14  for further proceedings.

15

16                      *VII.   SCHEDULING ORDER*

17      These Findings and Recommendations will be referred to a
18  district judge.  Objections, if any, are due by **September 3, 2013**.
19  If no objections are filed, then the Findings and Recommendations
20  will go under advisement on that date.  If objections are filed,
21  then any response is due by **September 20, 2013**.  By the earlier of

22

23  _____

24      [3]It also may be appropriate to obtain records from the
    treating source who originally prescribed Adderall.  The first men-
25  tion of Adderall in the record is C.C.'s kindergarten report, indi-
    cating C.C. was having problems despite taking Adderall. (*See* A.R.
26  143)  When Robertson took C.C. to see Dr. Grenier for the first
    time, on May 7, 2008, Robertson stated she thought C.C. "may be
27  ADHD."  (A.R. 235)  The record contains no evidence of who pre-
    scribed the Adderall initially, or the diagnosis leading to the
28  prescription.

30 - FINDINGS & RECOMMENDATION

1  the response due date or the date a response is filed, the Findings

2  and Recommendations will go under advisement.

3       IT IS SO ORDERED.

4                          Dated this 14th day of August, 2013.

5

6                          /s/ Dennis J. Hubel

7                          _____

8                          Dennis James Hubel
                           Unites States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31 - FINDINGS & RECOMMENDATION